## HORTON *v.* GEORGIAN COMPANY.

No. 8431.   AUGUST 10, 1932.

*Branch & Howard, Anderson, Rountree, Crenshaw & Hansell,* and *M. C. Horton,* for plaintiff.

*Randolph & Woodruff, Harold Hirsch, Marion Smith,* and *D. F. McClatchey Jr.,* for defendant.

RUSSELL, C. J.   This was an action brought by the plaintiff against the defendant, in which the plaintiff sues for $100,000 damages.   Since the defendant is alleged to be the publisher of a newspaper, it may be presumed that the action is based upon the

provisions of the Civil Code of (1910), § 4431, which had its origin in the act of 1893 (Ga. L. 1893, p. 131), instead of under the provisions of § 4428, which pertains to the subject of libel generally. In the superior court the petition was dismissed on general demurrer. The plaintiff carried the case by bill of exceptions to the Court of Appeals, where the judgment of the lower court was affirmed. It is now before this court upon a writ of certiorari to the Court of Appeals, which was allowed by this court in view of the importance of the questions involved and the extensive scope of the propositions presented as affecting the public generally.

Plaintiff's petition alleges that during the months of October and November, 1929, the Georgian Company published each day more than one edition of a newspaper, The Atlanta Georgian, under different designations. Plaintiff is a member of the firm of Horton Brothers, a firm composed of O. E. Horton and M. C. Horton, practicing attorneys at law in the State of Georgia, their office being in the City of Atlanta. On Wednesday, October 30, 1929, there was published in the home edition of the Atlanta Georgian, on the front page of the paper, with conspicuous headlines, an article in which petitioner and the firm of Horton Brothers, of which he is a member, were mentioned. The article referred to is attached to the petition as exhibit 1. The headlines are as follows:

"ATLANTA GEORGIAN—WEDNESDAY, OCTOBER 30, 1929

HOME EDITION.

"EXPECT POISON MURDER PLOT BARING HERE.

"Exhuming of Woman's Body May Reveal 13-year old Slaying.

"Revelation of a poison murder plot, through which two women met their death 13 years ago, loomed as a possibility to-day with the exhumation in Anderson, S. C., yesterday of the body of Mrs. Clemmie Garrison Tucker, former wealthy Atlantan. As an outgrowth of the strange order for the disinterment of the woman's body, two prominent Atlanta attorneys have been named in a Fulton County superior court suit charging they misused funds left by Mrs. Tucker 'for the education of poor girls,' The Georgian learned exclusively to-day. According to Sam Murrell, member of the Atlanta law firm of Murrell, Murrell, and Murrell, who secured the court order for Mrs. Tucker's disinterment and having her vital organs analyzed for traces of poison by the South Carolina chemist, Mrs. Tucker died here under mysterious circumstances which were

not probed at the time of her death. Mrs. Tucker, who left an estate, with no direct heirs, said to be valued at $300,000, died suddenly within three days after an unnamed woman spent the night in the house on South Pryor Street in which she lived alone.

### "VIOLENTLY ILL.

"She became violently ill the following day, and died in a local sanitarium, where it was said her death certificate has become lost. No investigation was then made. Less than two months later, according to Mr. Murrell, the woman who spent the night at Mrs. Tucker's home died suddenly also—under like circumstances. Recently, Mr. Murrell said, he came into definite information that Mrs. Tucker died as a result of poison. Two prominent Atlantans indirectly involved in the case are O. E. and M. C. Horton, of the law firm of Horton Brothers, with offices in the Atlanta Savings Bank Building.

### "WERE ADMINISTRATORS.

"The Horton Brothers were named as administrators of Mrs. Tucker's will, and in a suit filed in Fulton County superior court on October 23 the Murrell law firm charged them with misuse of funds left in their care by Mrs. Tucker. The section of the very short will which names the two Hortons follows, dated October 1, 1915. 'I give, devise, and bequeath to O. E. and M. C. Horton, in trust, all of my estate that I have at the time of my death, after payment of my funeral expenses, to be invested in safe securities and the income therefrom to be used for the purpose of educating poor, worthy girls of good family and legitimate. This fund to be used as the Frances Clementine Tucker Fund.'

### "CHARGE MISUSE.

"In the suit brought by the Murrell firm they charge the Hortons have misused the dead woman's money by loaning it instead of giving it for the purpose of educating the girls. They cite two alleged instances of such charges in the petition accompanying suit."

In exhibit 1 is also set forth a copy of an extract from The Atlanta Georgian of Wednesday, October 30, 1929 (on which the edition does not appear) an eight-column streamer—page 15:

### "SUSPECTED POISONING INVESTIGATED AFTER THIRTEEN YEARS WOMAN'S BODY DISINTERRED FOR EXAM.

"Sensational developments, involving a suspected 13-year-old

poison murder plot, were expected to-day, following the exhumation in Anderson, S. C., yesterday of the body of Mrs. Clemmie Garrison Tucker, former wealthy Atlantan. Mrs. Tucker's body was disinterred on an order secured by an Atlanta attorney, in Anderson, to examine her vital organs for traces of poison.

### "Dead 13 Years.

"The wealthy former Atlantan died here 13 years ago, and her body was removed to Anderson, her former home, for burial. She left an estate valued at more than $200,000, and circumstances surrounding her death, at the time, were not considered suspicious. Recently, however, the attorney for the woman's estate came into information which showed his former client died under mysterious circumstances. Operating with the greatest secrecy, he obtained a South Carolina court order to exhume the woman's body for a laboratory test of her vital organs, of which The Georgian learned exclusively yesterday. Her body was disinterred late yesterday and the vital organs were sent to the chemical department of Clemson College, Clemson, S. C., for analysis.

### "Accusation Withheld.

"The Atlanta attorney said to-day he is not prepared to name any suspects or institute criminal procedure until the analysis has been completed. He indicated his information had to do with the disposition of the woman's estate, but would point no finger in definite accusation. Mrs. Tucker died here 13 years ago after a short and sudden illness which was never clearly defined. Following funeral services here, her body was removed to Anderson for burial, and only the cursory examination of a body, necessary before issuance of a death certificate, was made, the local attorney said."

Also attached to the petition, as a part of exhibit 1, is an excerpt from Atlanta Georgian of Wednesday, October 30, 1929, "Sports Clean-Up Edition," a 5-column streamer:

"Trace Plot in Woman's Death. Suits Filed in Atlanta. Probe is Pushed.

"Exhuming of Body May Reveal Slaying Thirteen Years Ago.

"Revelations of a poison murder plot, through which two women met their death 13 years ago, loomed as a possibility to-day with the exhumation, in Anderson, S. C., yesterday of the body of Mrs. Clemmie Garrison Tucker, former wealthy Atlantan. As an out-

growth of the strange order for the disinterment of the woman's body, two prominent Atlanta attorneys have been named in a Fulton County superior court suit charging they misused funds left by Mrs. Tucker 'for the education of poor girls,' The Georgian learned exclusively today. According to Sam Murrell, member of the Atlanta law firm of Murrell, Murrell, and Murrell, who secured the court order for Mrs. Tucker's disinterment and having her vital organs analyzed for traces of poison by the South Carolina State chemist, Mrs. Tucker died here under mysterious circumstances which were not probed at the time of her death. Mrs. Tucker, who left an estate, with no direct heirs, said to be valued at $300,000, died suddenly, within three days after an unnamed woman spent the night in the house on South Pryor Street in which she lived alone.

## "Violently Ill.

"She became violently ill the following day and died in a local sanitarium where it was said her death certificate has become lost. No investigation was made then. Less than two months later, according to Mr. Murrell, the woman who spent the night at Mrs. Tucker's home died suddenly, also under like circumstances. Recently, Mr. Murrell said, he came into definite information that Mrs. Tucker died as a result of poison. Two prominent Atlantans indirectly involved in the case are O. E. and M. C. Horton, of the law firm of Horton Brothers, with offices in the Atlanta Savings Bank Building.

## "Were Administrators.

"The Horton Brothers were named as administrators of Mrs. Tucker's will, and in a suit filed in Fulton County superior court on October 23, the Murrell law firm charged them with misuse of funds left in their care by Mrs. Tucker. The section of the very short will which names the two Hortons follows, dated October 1, 1915. 'I give, devise, and bequeath to O. E. and M. C. Horton in trust all of my estate that I have at the time of my death, after the payment of my funeral expenses, to be invested in safe securities and the income therefrom to be used for the purpose of educating poor, worthy girls of good family and legitimate. This fund to be used as the Frances Clementine Tucker Fund.'

## "Charge Misuse.

"In the suit brought by the Murrell firm they charge the Hor-

tons have misused the dead woman's money by loaning it instead
of giving it for the purpose of educating the girls. They cite two
alleged instances of such charges in the petition accompanying the
suit. Both the Hortons emphatically denied misuse of the fund,
and said they were allowed, under the clause of the will quoted,
to loan the money if they saw fit. They did not know the dead
woman, they said, except in their capacity as attorney, having han-
dled her financial affairs before her death. As executors of her
estate, they said, they closed out her accounts and saw she was
buried in Silver Brook Cemetery, Anderson, South Carolina.

"BODY DISINTERRED.

"Mrs. Tucker's body was disinterred yesterday by Sheriff W. A.
Camp, Coroner J. M. Clark, and Marshall B. Smith, sexton of the
cemetery, all officials of Anderson County. Her vital organs were
sent to Dr. O. S. Johnson, State Chemist, at Clemson College, Clem-
son, S. C. If Mrs. Tucker is found to have died as a result of poi-
son, it will mean the exhumation by Fulton County authorities of
the body of the woman who spent the night with her on the night
she became ill and who died shortly afterwards, Mr. Murrell said.
Fulton County officials have been aiding him in the case so far, he
said, and are aware he has information concerning Mrs. Tucker's
death."

It is alleged in the petition (paragraph 8) that this publication
was libelous in that it was a false and malicious defamation of pe-
titioner, expressed in print as a publication in a newspaper, and
tending to injure the reputation of petitioner and exposing him to
public hatred, contempt, and ridicule. The petition alleges in the
ninth paragraph that the reference to him is particularly libelous in
connection with the statement as to the exhuming of the body of
Mrs. Tucker, because of the words "revelation of a poison murder
plot" followed by the statement: "As an outgrowth of the strange
order for the disinterment of the woman's body, two prominent At-
lanta attorneys have been named in a Fulton County superior court
suit charging they misused funds left by Mrs. Tucker 'for the edu-
cation of poor girls,' the Georgian learned exclusively to-day." The
tenth paragraph of the petition calls attention to the fact that the
two prominent Atlanta lawyers referred to in the ninth paragraph
are O. E. and M. C. Horton, as appears from a further statement
contained in said exhibit 1, that "Two prominent Atlantans indi-

rectly involved in the case are O. E. Horton and M. C. Horton of the law firm of Horton Brothers, with offices in the Atlanta Savings Bank Building." It is alleged that the article attached as exhibit 1 contains other false statements, to wit: "Mrs. Tucker died here under mysterious circumstances which were not probed at the time of her death. Mrs. Tucker, who left an estate, with no direct heirs, said to be valued at $300,000, died suddenly within three days after an unnamed woman spent the night in the house on South Pryor Street, in which she lived alone. She became violently ill the following day, and died in a local sanitarium where it was said her death certificate has become lost. No investigation was made then. Less than two months later, according to Mr. Murrell, the woman who spent the night at Mrs. Tucker's house also died under like circumstances. Recently, Mr. Murrell said, he came into definite information that Mrs. Tucker died as a result of poison. The Horton Brothers were named as administrators of Mrs. Tucker's will, and in a suit filed in Fulton County superior court on October 23, the Murrell law firm charged them with misuse of funds left in their care by Mrs. Tucker. In the suit brought by the Murrell firm they charge the Hortons have misused the dead woman's money by loaning it instead of giving it for the purpose of educating the girls. They cite two alleged instances of such charges in the petition accompanying the suit."

In various paragraphs of the petition, the foregoing excerpts from the publication are proved to be untrue according to the allegations of the petition. In the twelfth paragraph it is averred that the certificate referred to in the publication as having been lost was not and is not lost, but at the time of the publication of said article it was on file in the health department of the City of Atlanta. It was further alleged that the inference to be drawn from the articles attached as exhibit 1 was that Mrs. Tucker died the next day after she was taken ill, but that as a matter of fact she was in the sanitarium eight days after being moved there before she died, and that she died from pneumonia which developed from influenza, her death being a perfectly natural death.

Paragraph fourteen is as follows: "Petitioner shows that the said article was intended to, and did, convey by its direct charges and by insinuation, the idea that petitioner and his brother had been involved in a plot and conspiracy to bring about the death of

268

the said Mrs. Tucker by murdering her by the use of poison, and that petitioner and his brother were actuated by the motive, among other things, of getting possession of her estate, which was falsely represented in said article to be a large estate amounting to some $300,000, and the said article was capable of being misunderstood by the public, and was so understood, as making such charges against petitioner and his brother directly and by inference and insinuation, when in truth and in fact there was absolutely no foundation for any such charges and insinuations, and the defendant, by the slightest diligence and good faith, could .by investigating the matter have so learned and discovered, but instead of doing this it, with the purpose of attempting to build up a sensation even at the expense of wrecking the character and good reputation of petitioner and his brother and subjecting them to public hatred, contempt, and ridicule, recklessly, wilfully, wantonly, and maliciously published said article and said false and malicious charges and insinuations without endeavoring in any way in good faith to ascertain whether there was even any slight ground for such charges and insinuations against petitioner and his brother." It is alleged that the suits referred to in the articles were suits to recover, in one case $400 and in the other case $350, and the right of recovery was based upon an allegation that under the will of Mrs. Tucker the money should have been given to plaintiffs instead of loaned to them, and the plaintiffs, having repaid the loans, alleged that they were entitled to recover back the money. It is alleged that not only were the allegations in these suits as to the misuse of the funds wholly immaterial and not germane to the purpose of the action, but were libelous and actionable, and not privileged. Other paragraphs of the petition direct attention to the heavy headlines and the ·republication, in different form, of similar statements which have already been set out in exhibit 1, especial reference being made to the headlines preceding the article in this republication and the first paragraph thereof, in which it is said: "Sensational developments, involving a suspected 13-year old poison murder plot, were expected today following the exhumation in Anderson, S. C., yesterday of the body of Mrs. Clemmie Garrison Tucker, former wealthy Atlantan." The petition also deals at length with statements contained in the "Sports Clean-Up Edition" of October 30, 1929, to which reference has already been made. The headlines in

this article, as alleged in paragraph eighteen, are preceded by a 5-column streamer reading:

"TRACE PLOT IN WOMAN'S DEATH
SUITS FILED IN ATLANTA. PROBE IS PUSHED.
"EXHUMING OF BODY MAY REVEAL
SLAYING THIRTEEN YEARS AGO."

Other paragraphs of the petition allege that similar statements were published in the Sports Edition of the Atlanta Georgian of October 31, 1929; that on November 1, 1929, under the headlines "Part in Tucker Estate told by E. C. Peek," the Atlanta Georgian published another article. This article refers to Mr. Peek as an Atlanta attorney in the Fulton County jail, awaiting trial on the charge of larceny, who stated that he had aided in administering the estate of Mrs. Tucker and that he was formerly connected with the law firm of Horton Brothers, administrators of the Tucker estate. In paragraph 24 it is alleged that the publication of the statements made by Mr. Peek in connection with the statement that Mr. Peek was in jail awaiting trial on a charge of larceny, and the further publication of Mr. Peek's statement that he had participated in the administration of the Tucker estate, which is wholly untrue, was intended to and did imply that his former associates were of the same general character, and, taken in connection with other publications, was intended to and did imply that Peek, who was waiting trial on a charge of larceny, had assisted petitioner and his brother in the misuse of the funds of Mrs. Tucker's estate.

In the twenty-fifth paragraph of the petition it is alleged that the suits filed in court against petitioner and his brother by Mrs. Murrell and Miss Bailey were not privileged matter. No judicial action had been taken upon either of them, and the publication of the contents of the suits by a newspaper before the court had taken any action in the cases was not privileged matter, but was libelous and actionable. Paragraph 30 alleges that the publications attached to the petition as exhibits Nos. 1, 2, 3, 4, 5, and 6, were malicious, being actuated by a desire to injure and defame petitioner and hold him up to the public in the community in which he lives and the territory in which he practices his profession to ridicule and opprobrium. In paragraph 31 it is said that "if actual malice does not appear, implied malice presumptively appears from the publication of the libelous matter, in that the defendant showed a

reckless disregard for the rights of your petitioner, without seeking to ascertain the truth about the matters and things published and against the absolute denials by your petitioner and his brother of the truth of such statements prior to the time when the publications ceased." In paragraph 32 it is alleged that the repetition of the libelous statements in different editions of the paper and on different days, in spite of the denials made by petitioner and his brother, justify the ·implication of malice such as would authorize the recovery of punitive and exemplary damages. There are various other allegations in succeeding paragraphs of the petition; but we think the excerpts to which we have referred are enough to show that the petition in this case is sufficient to withstand the demurrers by which it is assailed.

Abbreviating the general demurrer filed by the defendant, this demurrer rests upon four grounds: 1. The petition sets forth no cause of action. 2. The words published are not libelous and not capable of the construction placed on them by the innuendoes; and further, because the publications alleged to be libelous are repetitions of averments contained in a regular pleading in a court of competent jurisdiction in this State, and of a similar court in the State of South Carolina, and as such were privileged and not libelous; and further, because the publications referring to said plaintiff were fair and honest reports of a judicial body, made without malice, and as such are privileged. 3. Because the petition fails to allege the particular loss or injury claimed by the plaintiff, or any items of special damage. 4. The petition should be dismissed because all of the publications declared on and set up, when construed together, are not libelous.

The petition for certiorari alleges that the decision of the Court of Appeals affirming the judgment of the trial court sustaining the general demurrer is erroneous for the following reasons: 1. Because it holds as a matter of law that the newspaper articles set forth in the petition were not libelous, when, as petitioner contends, the same were libelous per se, in that the petition shows that the defendant published the articles charging him plainly and directly with murder. 2. In that it holds as a matter of law that the articles were not libelous, when, as petitioner contends, even if the articles were not libelous per se, it was a question of fact for determination by a jury, under the allegations of the petition, whether they

were in fact libelous. 3. In that it fails to allow the jury to pass on the question of fact whether or not a libel had been published by the defendant of and concerning the plaintiff. 4. In holding as a matter of law that petitioner had not been charged by insinuation to be engaged in a plot to bring about Mrs. Tucker's death by the use of poison. 5. In that it failed to allow the jury to pass on the questions of fact raised by the petition. 6. In that it is in direct conflict with decisions of the Supreme Court to the effect that it is a jury question as to whether a particular publication is libelous, and whether or not said libelous matter was published concerning a particular person.

Having in mind the well-settled rule that even though portions of a petition may be subject to demurrer, the petition as a whole should not be dismissed upon general demurrer if there is any portion of the petition which sets forth a cause of action (*Blaylock* v. *Hackel*, 164 *Ga.* 258, 138 S. E. 333), we are of the opinion that the Court of Appeals erred in the judgment affirming the judgment of the trial court dismissing the action. The six assignments of error to which we have referred may be more readily dealt with by considering the 2d, 3d, 5th, and 6th together. We think this grouping will conduce both to brevity and clarity. The question first before us, then, is to determine the exact province of a jury in the trial of a suit for libel against the publisher of a newspaper. The jury, of course, must take the law from the court. But is not a judge, in a suit for libel, debarred by the law itself from declaring to the jury the conclusions reached by him from the facts stated in the petition as the law, by reason of the fact that the solution of the question whether the defendant has committed libel is dependent upon questions of fact which under our system can only be adjudicated by a jury? The Civil Code (1910), § 4431, declares: "Any false and malicious defamation of another in any newspaper, magazine, or periodical, tending to injure the reputation of any individual and expose him to public hatred, contempt, or ridicule, shall constitute a newspaper libel, the publication of such libelous matter being essential to recovery." To charge one in writing with the commission of a crime is libelous per.se; but under the terms of the code section, a false defamation of another in any newspaper, which tends to injure the reputation of any individual and expose him either to hatred, contempt, or ridicule, is

libelous. After a careful consideration of the newspaper articles which are attached to the petition as part thereof, we can not say, as a matter of law, that this publication would not tend to injure the reputation of the petitioner. And this of course tends to injure him in his business. It matters not that in some instances the damage would be greater, and in others less, proportioned upon the extent to which the reputation of the injured party is well established. If a publication tends to injure the reputation and expose any person even to contempt or ridicule, the publication of matter which is false and malicious is declared to be libelous. It is true that certain newspaper publications are privileged; but the privilege is not absolute, it is conditional only; and the "liberty of the press" will not authorize a violation of section 4431 of the Code. *Lowe v. News Publishing Co.,* 9 *Ga. App.* 103 (70 S. E. 607).

Under section 4432 of the Code of 1910 a fair and honest report of the proceedings of judicial bodies or court proceedings shall be deemed privileged communications. However, this privilege does not extend to reports which are not fair and honest but which include additional matter in the way of statements or inferences of the publisher. The petition shows that a part of the alleged published matter was a reproduction of matter which appeared in the files of a court. Whether the publication to this extent was privileged as being a report of the proceedings of a judicial body is a question which need not be decided, since the publication went further and, instead of containing a mere account of what appeared in the files of a court, proceeded to give a narrative of events which was susceptible of the construction that the plaintiff's firm was involved in the alleged mysterious death of Mrs. Tucker. One of the publications referred to a "poison murder plot," and then stated that "as an outgrowth of the strange order for the disinterment of the woman's body, two prominent Atlanta attorneys have been named in a Fulton County superior court suit charging they misused funds left by Mrs. Tucker 'for the education of poor girls,' The Georgian learned exclusively to-day." As a part of the same publication the following language was used: "VIOLENTLY ILL. She became violently ill the following day and died in a local sanitarium, where it was said her death certificate has become lost. No investigation was then made. Less than two months later, according to Mr. Murrell, the woman who spent the night at Mrs. Tuck-

er's home died suddenly also—under like circumstances. Recently, Mr. Murrell said, he came into definite information that Mrs. Tucker died as a result of poison. Two prominent Atlantans indirectly involved in the case are O. E. and M. C. Horton, of the law firm of Horton Brothers, with offices in the Atlanta Savings Bank Building. WERE ADMINISTRATORS. The Horton Brothers were named as administrators of Mrs. Tucker's will, and in a suit filed in Fulton County superior court on October 23 the Murrell law firm charged them with misuse of funds left in their care by Mrs. Tucker." The statements that Mrs. Tucker died from poison and that O. E. and M. C. Horton were indirectly involved "in the case," followed by the further statements that Horton Brothers were the administrators of Mrs. Tucker and that suits had been filed against them, charging misuse of the funds of the estate, were communications or publications susceptible of conveying the idea that Horton Brothers were in some way involved in the slaying of Mrs. Tucker. The publication as alleged may contain other statements which tended to injure the plaintiff, and which could not be defended upon the ground of privilege.

In Newell on Slander and Libel (4th ed.), § 464, the following statement is made: "The publisher must add nothing of his own. He must not state his opinion of the conduct of the parties, or impute motives therefor; he must not insinuate that a particular witness committed perjury. This is not a report of what occurred, and to this no privilege attaches." In connection with this statement the author cites and comments upon certain decisions, as follows: "The New York 'Evening Express' published a report stating that the plaintiff had been dismissed from the police force. Preceding the article the publishers added, 'Blackmailing by a policeman,' as a heading. In an action brought for libel it was held that this addition destroyed the privilege. Edsall v. Brooks, 17 Abb. Pr. (N. Y.) 221, 26 How. Pr. 426, 25 N. Y. Superior Ct. 29. A captain of a vessel was charged before a magistrate with an indecent assault upon a lady on board his own ship. The defendant's newspaper published a report of the case, interspersed with comments which assumed the guilt of the captain, commended the conduct of the lady, and generally tended to inflame the minds of the public violently against the accused. Held, that no privilege attached to such comments, and that the report was neither fair nor

dispassionate. R. v. Fisher, 2 Camp. 563; R. v. Lee, 5 Esp. 123; R. v. Fleet, 1 B. & Ald. 379. The 'Observer' gave a true and faithful account of some proceedings in the insolvent debtor's court, but headed it with the words, 'Shameful conduct of an attorney.' *Held,* that for those words, as they were not justified, the plaintiff was entitled to recover. Clement v. Lewis (Exch. Ch.), 3 Br. & B. 297, 3 B. & Ald. 702, 7 Moore, 200; Bishop v. Latimer, 4 L. T. 775." These statements were quoted with approval by the Court of Appeals of this State in *Augusta Chronicle Publishing Co.* v. *Arrington,* 42 *Ga. App.* 746, 749 (157 S. E. 394). Upon a review of the entire petition, and especially after an analysis of the language used in the alleged publication, it is plain that a jury, in their construction of the words used and the inferences reasonably to be reached in connection with their context, would be authorized to render a finding in some amount in favor of the plaintiff. It is therefore our opinion that the judgment sustaining the general demurrer and dismissing the petition was error, and that the Court of Appeals erred in affirming this judgment.

*Judgment reversed. All the Justices concur, except Atkinson, J., who dissents.*